UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                                      :

UNITED STATES OF AMERICA             :

            - v. -                                  :         S1 18 Cr. 579 (JSR)

ABELL OUJADDOU,                     :

               Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

                                                                           GEOFFREY S. BERMAN
                                                                           United States Attorney for the
                                                                           Southern District of New York
                                                                           One St. Andrew's Plaza
                                                                           New York, New York 10007

Christine I. Magdo
Andrew Thomas
Assistant United States Attorneys
 – Of Counsel –

**Table of Contents**

PRELIMINARY STATEMENT ....................................................................................................... 1
I.     OVERVIEW ........................................................................................................................ 1
II.    OUJADDOU'S BACKGROUND ....................................................................................... 2
III.   OUJADDOU'S CRIMINAL CONDUCT ........................................................................... 2
IV.    OUJADDOU'S COOPERATION ....................................................................................... 5
V.     SECTION 5K1.1 ANALYSIS .............................................................................................. 8
CONCLUSION .............................................................................................................................. 11

**PRELIMINARY STATEMENT**

In advance of the sentencing of defendant Abell Oujaddou, currently scheduled for October 11, 2019 at 2:00 p.m., the Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Oujaddou has rendered in the investigation and prosecution of Sebastian Pinto-Thomaz. In light of these facts, which are set forth below, and assuming that Oujaddou continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Oujaddou in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

I.   **OVERVIEW**

Sebastian Pinto-Thomaz was a credit ratings analyst who misappropriated material, non-public information ("Inside Information") from his employer regarding the upcoming acquisition of the Valspar Corporation ("Valspar") by the Sherwin-Williams Company ("Sherwin-Williams"). Pinto-Thomaz disclosed the Inside Information to two individuals, one of whom was Oujaddou, in order for those individuals to execute trades in Valspar prior to the public announcement of the acquisition (the "Announcement"). Based on the Inside Information he learned from Pinto-Thomaz, Oujaddou purchased Valspar stock in the ten days prior to the Announcement. Shortly after the Announcement, Oujaddou sold the Valspar stock he had purchased, for a profit of approximately $192,080. A few days later, Pinto-Thomaz contacted Oujaddou in order to collect his agreed-upon share of the trading profits. Pinto-Thomaz and Oujaddou met at the Home Depot located near Oujaddou's salon, where Oujaddou handed Pinto-Thomaz an envelope with $7,500 in cash.

## II. OUJADDOU'S BACKGROUND

Oujaddou was born and raised in Morocco until the age of five, when he moved to France with his parents and four siblings. (PSR ¶ 91). Oujaddou attended school through the first year of high school, then completed an auto mechanic training course and most of an 18-month hair stylist training course in France. (*Id.* ¶ 115). In 1984, Oujaddou moved to New York to pursue work as an actor and hair stylist. (*Id.* ¶ 95). Over time—and after a stint in California—Oujaddou focused his career on hair styling, returned to New York, and worked at two salons. (*Id.* ¶¶ 122-123). From 2008 to 2010, Oujaddou worked with his now-wife to set up their own salon, which became known as the Marie Robinson salon. (*Id.* ¶ 124). The salon has become a commercial success, and both Oujaddou and his wife continue to work there.

Oujaddou and his wife live in Chelsea with their elementary-school-aged son as well as Oujaddou's son from a previous relationship, who is a college student. (*Id.* ¶¶ 100-101). Oujaddou is a naturalized United States citizen. (*Id.* ¶ 102).

## III. OUJADDOU'S CRIMINAL CONDUCT

On or about March 8 or 9, 2016, Sebastian Pinto-Thomaz visited the Marie Robinson salon for a haircut appointment with Oujaddou. (Tr. at 227). Oujaddou had known Pinto-Thomaz since Pinto-Thomaz was a teenager, as a result of Oujaddou's friendship with Pinto-Thomaz's mother, Natalie Pinto-Thomaz. Natalie Pinto-Thomaz had been Oujaddou's client for many years; Sebastian Pinto-Thomaz occasionally had Oujaddou cut his hair as well. (*Id.* at 218, 220, 223).

During the March 2016 appointment, Sebastian Pinto-Thomaz told Oujaddou that he had received information through his job from which they could both profit. (*Id.* at 228). Specifically, Oujaddou later testified at trial that Pinto-Thomaz told him that he was working on a merger that

was going to happen in a couple of weeks and it could be a chance for both of them to make some money. (*Id.*) In response, Oujaddou said to Pinto-Thomaz, "Don't do it. Remember Martha Stewart," and Pinto-Thomaz replied, "Dude, this is not insider trading. You're my hair stylist. You are cutting my hair and you saw some papers that I was working on and that's how you traded." (*Id.*) Oujaddou asked for the name of the company and the price of its stock; Pinto-Thomaz told him that Sherwin Williams was buying Valspar, and that Valspar was trading at approximately $80 per share. (*Id.*). When Oujaddou said that the stock was too expensive, Pinto-Thomaz suggested that Oujaddou buy stock options instead and tried to explain to him how options work. (*Id.*) They then discussed what percentage of the profits Pinto-Thomaz would get if Oujaddou went ahead with the trading; Pinto-Thomaz initially asked for 15 percent but later agreed to a cut of 10 percent of the profits. (*Id.*). Oujaddou finished the haircut and told Pinto-Thomaz he was going to look into Valspar stock and think about whether to purchase any. (*Id.*). Oujaddou knew at the time that Pinto-Thomaz was not supposed to disclose the Inside Information to him. (*Id.* at 234).

On March 10, 2016, Oujaddou made his first purchase of Valspar stock in an individual brokerage account that he owned (the "Individual Account") by buying 1,000 shares of Valspar common stock. (*Id.* at 237; GX 202). Over the course of the next eight days, as he continued to receive Inside Information from Pinto-Thomaz confirming that the acquisition would take place, Oujaddou continued to purchase Valspar common stock in the Individual Account. (*Id.* at 237-39, 244; GX 202). In the Individual Account, Oujaddou purchased a total of approximately $536,500 worth of shares of Valspar stock. Oujaddou also traded in Valspar in a second brokerage account that he owned (the "Retirement Account") between March 14 and March 18, 2016. (*Id.* at 242, GX 204).

Sherwin-Williams's plan to acquire Valspar was publicly announced on Sunday, March 20, 2016. Over the next few days, Oujaddou sold all of the Valspar stock he had purchased. He netted a profit of approximately $144,805 in the Individual Account (Tr. at 248; GX 202) and approximately $46,000 in the Retirement Account (Tr. at 249; GX 204). A couple days after Oujaddou finished selling the Valspar shares, Pinto-Thomaz asked Oujaddou for his share of the profits. Oujaddou proposed that they meet the next day at the Home Depot near his salon. (Tr. at 250). That evening, Oujaddou took $7,500 from an emergency cash fund that he and his wife kept at home, and put the money in a manila envelope. (*Id.* at 251-52). Oujaddou testified that he arrived at the figure of $7,500 by dividing the profits he made in his Individual Account (approximately $144,805) by a factor of approximately two, to account for the taxes he would have to pay; of the remaining $75,000, he gave ten percent, or $7,500, to Pinto-Thomaz. (*Id.* at 252). Oujaddou did not disclose to Pinto-Thomaz that he traded in a second account, and also did not give Pinto-Thomaz any portion of the profits he had made in his Retirement Account. (*Id.* at 257). The following day, Oujaddou met Pinto-Thomaz on the lower level of the Home Depot in Chelsea at a pre-arranged meeting spot in the paint aisle, and handed him the envelope containing the cash. (*Id.* at 253-54).

A few months later, Sebastian Pinto-Thomaz came to Oujaddou's apartment to tell him about a letter that his firm had received from FINRA; attached to the letter was a list of roughly 200 individuals—including Oujaddou—who had traded in Valspar prior to the public announcement that it would be acquired by Sherwin-Williams. (*Id.* at 255-56). Pinto-Thomaz assured Oujaddou that he had denied knowing anyone on the list. (*Id.* at 256). Before Pinto-Thomaz left Oujaddou's apartment, the two of them agreed they would no longer see or

4

communicate with each other. (*Id.* at 257). In fact, the next time they saw each other was on the day of their arrests.

### IV.   OUJADDOU'S COOPERATION

Oujaddou's willingness to cooperate with the Government's investigation became apparent shortly after his arrest. On June 26, 2018, Oujaddou, Pinto-Thomaz, and a third defendant not known to Oujaddou (Jeremy Millul) were arrested on a criminal complaint, charging them with illegally trading on the Valspar Inside Information. That day, FBI agents seized Oujaddou's Blackberry mobile device (the "Blackberry"), for which the agents had obtained a search warrant. Oujaddou immediately provided the passcode for the Blackberry, and as a result, the FBI agents were able to begin to execute the search of the Blackberry on the day of the arrests. Oujaddou also expressed a desire to talk to the agents about his conduct, but said that he wished to consult with an attorney first.

Within a day or two after his arrest, Oujaddou's counsel at the time, Robert Anello, requested a meeting with the Government to discuss possible avenues of cooperation. On July 2, 2018, Mr. Anello met with representatives of the Government and provided an attorney proffer regarding Oujaddou's insider trading conduct. (Tr. at 409). On July 27, 2018, Oujaddou and his new counsel, Scott Morvillo, met with representatives of the Government. (*Id.*) During that meeting, Oujaddou himself recounted the details of his criminal conduct and answered questions from the Government. He provided a complete and truthful account of the events, including specifics that were not previously known to the Government, such as the fact that Pinto-Thomaz had conveyed the Inside Information to Oujaddou during a haircut at the salon, that Pinto-Thomaz had asked for a share of Oujaddou's trading profits, that Oujaddou had given Pinto-Thomaz $7,500 in cash after the trading, and that Pinto-Thomaz had visited Oujaddou at his apartment to discuss the FINRA letter.

After Oujaddou's proffer, the Government evaluated the totality of its evidence against Pinto-Thomaz, and decided that the testimony of Oujaddou would not be necessary to convict Pinto-Thomaz in the unlikely event that Pinto-Thomaz were to proceed to trial. The Government conveyed to Oujaddou its decision to not enter into a cooperation agreement with him at that time. Even without the benefit of a cooperation agreement, Oujaddou accepted responsibility for his conduct and executed a standard plea agreement with the Government. (Tr. at 409). On October 3, 2018, pursuant to that plea agreement, Oujaddou entered a plea of guilty to Count One of the Indictment. (PSR ¶ 5). As part of his plea agreement, Oujaddou agreed to forfeit his profits from the insider trading conspiracy. (Docket No. 53).

After Oujaddou initially pled guilty as described above, the Government's investigation into Pinto-Thomaz and Millul continued. Both of the remaining defendants had filed extensive pre-trial motions, and appeared to be proceeding to trial. The Government once again examined the totality of its evidence against Pinto-Thomaz, and decided that Oujaddou's testimony would substantially strengthen the Government's case at any trial. In particular, the only way for the Government to prove that Pinto-Thomaz anticipated receiving (and did in fact receive) a portion of the illicit proceeds of the scheme was through the testimony of Oujaddou. Oujaddou's testimony about the agreement to share the trading profits and about his cash payment of a portion of those profits to Pinto-Thomaz was compelling evidence that provided a clear motive for Pinto-Thomaz's conduct. At the Government's request, Oujaddou withdrew his prior plea, and entered a new plea of guilty, pursuant to a cooperation agreement, to Counts One and Two of a Superseding Information, S1 18 Cr. 579 (JSR) (the "Superseding Information") (Docket No. 62). Count One of the Superseding Information consisted of the same securities fraud conspiracy charge to which Oujaddou had previously pled guilty. (*Id.*) Count Two of the Superseding

Information consisted of a new charge of substantive securities fraud. (*Id.*) As before, Oujaddou agreed to forfeit his trading profits.

On or about November 5, 2018, based in part on new information provided to the Government by Oujaddou, a grand jury returned a Superseding Indictment, S2 18 Cr. 579 (JSR) (the "Superseding Indictment") (Docket No. 64), against Pinto-Thomaz and Millul. The Superseding Indictment contained new details about Pinto-Thomaz's conduct that were not part of the Indictment, including details about the conversation between Pinto-Thomaz and Oujaddou during Pinto-Thomaz's haircut, such as the fact that Pinto-Thomaz had told Oujaddou that Sherwin-Williams and Valspar were going to merge and that, as a result, Valspar's stock would go up in price, and the fact that Oujaddou agreed to give Pinto-Thomaz ten percent of his profits from trading in Valspar. (*Id.* ¶ 15). The Superseding Indictment also newly alleged that, in late March 2016, Oujaddou gave Pinto-Thomaz $7,500 in cash, which represented Pinto-Thomaz's share of Oujaddou's profits from the illicit trading in Valspar. (*Id.* ¶ 19).

In preparation for his testimony at the trial of Pinto-Thomaz, Oujaddou met with representatives from the Government on approximately six occasions and also participated in one telephone conference. At no time did Oujaddou attempt to minimize his culpability, to exaggerate Pinto-Thomaz's culpability, or to conceal embarrassing information. He also reviewed records in the Government's possession and provided additional records requested by the Government. Oujaddou made himself available whenever the Government asked to speak with him, often on short notice. Oujaddou then testified at trial over the course of three days, the majority of which were devoted to his cross-examination. Oujaddou candidly testified each day about his own criminal conduct and the insider trading conspiracy, including the fact that he did not uphold his end of the criminal agreement into which he had entered with Pinto-Thomaz.

7

Specifically, Oujaddou admitted that he hid some of his Valspar trading from Pinto-Thomaz, and gave Pinto-Thomaz the agreed-upon ten-percent cut of only a portion of his total trading profits. (Had Oujaddou upheld his end of the bargain and given Pinto-Thomaz ten percent of his total after-tax trading profits, the payment to Pinto-Thomaz would have been approximately $10,000, rather than $7,500). Oujaddou gave the jury an insider's view of the insider trading conspiracy, including, for example, an explanation of the communications—logged on telephone toll records—that he had had with Pinto-Thomaz and Natalie during the relevant time period. He also testified about the personal benefit that Pinto-Thomaz anticipated receiving by tipping Oujaddou.

## V. SECTION 5K1.1 ANALYSIS

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. § 5K1.1(a). The application of each of those factors to Oujaddou's cooperation is set forth below.

### A. "[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1))

The information and testimony provided by Oujaddou enabled the Government to seek the Superseding Indictment and meaningfully contributed to the conviction of Pinto-Thomaz after trial. Oujaddou testified about the pecuniary benefit that Pinto-Thomaz explicitly asked to receive in exchange for the Inside Information he provided to Oujaddou.[1] While it would have

---

[1] The personal benefit that Pinto-Thomaz anticipated receiving by tipping Oujaddou need not have been pecuniary in nature in order for the jury to find him guilty of insider trading. For example, the jury found Pinto-Thomaz guilty of engaging in an insider trading conspiracy with Millul, where there was no evidence that Pinto-Thomaz anticipated a monetary benefit for himself. However, Millul was a closer friend to both Pinto-Thomaz and his mother than was Oujaddou. For example, the evidence at trial included a number of communications between Millul and Pinto-Thomaz reflecting that they socialized with each other (GX 714), went out to dinner together (GX 718), talked about romantic relationships (GX 716), joked about trying out a

8

been conceivable for a jury to conclude that Pinto-Thomaz had "gifted" the Inside Information to Oujaddou, as he had to Millul, the evidence of such a motive was thin, and certainly would not have provided the jury with the complete picture of what had actually occurred. The truth of Pinto-Thomaz's actual motive – that he wanted money to buy an engagement ring – was far more compelling, and Oujaddou was the only person who could testify about their conversation at the salon and their meeting at Home Depot. Moreover, Oujaddou's trial testimony was particularly powerful because he was candid and forthcoming throughout both his direct and cross examination, answering each question as best he could remember and never trying to deflect blame from himself. Oujaddou's assistance also helped the Government locate corroborating details of his account, such as the paint marker and receipt showing Pinto-Thomaz had visited the very Home Depot at which Oujaddou said he met him to deliver the cash.

### B. "[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2))

From his first proffer with the Government in July 2018 through his testimony at trial in April 2019, Oujaddou has provided truthful, complete and reliable information and testimony. He was remorseful and humble throughout the process. He gave an honest account of his conduct from the outset of his interactions with the Government, and that candor continued throughout his cooperation. He was scrupulous about disclosing details that he recalled, but equally scrupulous about not "filling in" details that he could not recall, as illustrated in the following two examples.

Oujaddou told the Government, and testified at trial, that prior to the March 2016 haircut, the last time he recalled seeing Pinto-Thomaz was sometime in 2014. (Tr. at 223). However,

---

sauna together (GX 709) and wished each other well (GX 717). The strength of Millul's friendship with Pinto-Thomaz allowed the jury to conclude that Pinto-Thomaz provided the Inside Information to Millul as a "gift" to a trading friend.

9

Oujaddou also provided to the Government and to Pinto-Thomaz's counsel appointment records from his salon. Those records indicated that Oujaddou had cut Pinto-Thomaz's hair in December 2015, which contradicted his memory and his testimony of events. (Tr. 308-309). Oujaddou was extensively cross-examined about the apparent inconsistency between his memory and his salon's records. While the temptation to change his account in the face of contrary evidence from his own records must have been strong, he did not waiver, and persisted in testifying only to events that he himself was able to recall. (Tr. 313).

Second, Oujaddou told the Government and later testified at trial that he had met Pinto-Thomaz at Home Depot to give him $7,500. Since Oujaddou had taken the money from a supply of cash that he and his wife kept at home in case of emergency, there were no ATM receipts or other records to corroborate or contradict his account. Oujaddou knew that he had short-changed Pinto-Thomaz of approximately $2,500 by giving him a portion of the proceeds from only one of the two brokerage accounts in which Oujaddou had traded Valspar. (Tr. 252, 257). In this example, Oujaddou easily could have claimed that he gave Pinto-Thomaz $10,000—the amount that would have been consistent with their agreement—and it would have been difficult, if not impossible, to prove otherwise. But, on the contrary, Oujaddou owned up to the embarrassing fact that he had been stingy in not upholding his end of the bargain with his co-conspirator.

### C.  "[N]ature and extent" of assistance (§ 5K1.1(a)(3))

Oujaddou's assistance to the Government consisted of providing information that was presented to the grand jury that returned the Superseding Indictment, attending meetings with the Government in preparation to testify at trial, and testifying over the course of three days, during which he was subject to a lengthy and vigorous cross-examination. The Government did not ask

10

Oujaddou to engage in any pro-active cooperation (such as recording conversations), but every act of cooperation that the Government asked of him, he willingly performed.

### D. "[A]ny injury suffered, or any danger or risk of injury to the defendant or [the defendant's] family" resulting from assistance (§ 5K1.1(a)(4))

Oujaddou incurred more embarrassment and stress as a testifying cooperator than he would have had he simply pled guilty. Fortunately, the Government is unaware of any safety risks posed by his testimony. Nonetheless, for a man who had not graduated from high school and whose native language was not English, testifying at trial was a nerve-wracking and taxing undertaking.

### E. "[T]imeliness" of assistance (§ 5K1.1(a)(5))

Oujaddou's willingness to assist the Government manifested on the day of his arrest. As described above, he willingly provided FBI agents with the passcode to his Blackberry and informed them that he wished to cooperate after consulting with an attorney. He then did consult with an attorney, and that attorney reached out to the Government shortly thereafter to set up an attorney proffer. Approximately one month after his arrest, Oujaddou himself attended the first of several proffers with the Government.

Finally, with respect to relative culpability vis-à-vis his co-defendants, the Government considers Oujaddou the least culpable of the three, despite the fact that he made the most money from the insider trading. Were it not for Pinto-Thomaz's proposal during that fateful haircut in March 2016, it seems highly unlikely that Oujaddou would ever have engaged in insider trading. And, unlike Millul, who engaged in additional insider trading with Pinto-Thomaz in 2018, Oujaddou came to regret his criminal conduct and kept as much distance between himself and Pinto-Thomaz as possible.

## CONCLUSION

As set forth above, the Government believes that Oujaddou provided substantial and timely assistance in the investigation and successful prosecution of Sebastian Pinto-Thomaz. The Government therefore expects to request at sentencing that the Court sentence Oujaddou in light of the relevant facts stated above and the factors set forth in Section 5K1.1 of the Sentencing Guidelines.

          Respectfully submitted,

          GEOFFREY S. BERMAN
          United States Attorney
          Southern District of New York

By:    /s/
          Christine I. Magdo
          Andrew Thomas
          Assistant United States Attorneys
          Southern District of New York
          (212) 637-2297 / 2106